UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GEORGIA A. POWELL,

        Plaintiff,                    CIVIL ACTION NO. 11-15074

vs.

                                    DISTRICT JUDGE BERNARD A. FRIEDMAN

COMMISSIONER OF               MAGISTRATE JUDGE MONA K. MAJZOUB
SOCIAL SECURITY,

        Defendant.
_____/

REPORT AND RECOMMENDATION

**I.**    **RECOMMENDATION:**  This Court recommends that Plaintiff's motion for remand (docket no. 11) be denied, Defendant's motion for summary judgment (docket no. 12) be granted, and Plaintiff's complaint be dismissed.

**II.**    **PROCEDURAL HISTORY:**

Plaintiff filed an application for a period of disability and disability insurance benefits on June 8, 2009, alleging disability beginning December 23, 2008. (TR 165-71). The Social Security Administration denied benefits and Plaintiff filed a timely request for a *de novo* hearing. On May 3, 2011 Plaintiff appeared with counsel in Detroit, Michigan and testified at a hearing held before Administrative Law Judge (ALJ) Oksana Xenos. (TR 33-49). Vocational Expert (VE) David J. Holwerda also appeared and testified at the hearing. In a June 2, 2011 decision the ALJ found that Plaintiff was not entitled to disability benefits because there were jobs that exist in significant numbers in the national economy that she could perform. The Appeals Council declined to review the ALJ's decision and Plaintiff filed a timely complaint for judicial review. Plaintiff's motion for

remand and Defendant's motion for summary judgment are currently before the Court.

## III. PLAINTIFF'S TESTIMONY AND MEDICAL EVIDENCE

### A. Plaintiff's Testimony

Plaintiff was thirty-seven years old on December 23, 2008, the alleged onset of disability date. She completed high school and earned an Associates degree in business after completing two years of college. (TR 37). She worked for seventeen years as a medical biller. (TR 38). Plaintiff testified that she and her son live with her parents. (TR 42). She has a driver's license and is capable of driving to her errands. (TR 39).

Plaintiff testified that she became disabled in December 2008 after she was diagnosed with multiple sclerosis. She stated that she has a difficult time remembering things, communicating, and reading novels. (TR 37-38, 40). She stated that she can no longer work in medical billing because she is unable to read the doctors' writing and look up diagnostic codes at the speed that would be required of her. (TR 42-43). She testified that she spends her days running errands, using the computer, talking and visiting with friends, and helping her son manage his homework. (TR 39). She reported that it takes her three hours to grocery shop. Plaintiff testified that she attends church and she has no trouble taking care of her personal hygiene, bathing, or dressing. (TR 40). Plaintiff testified that she takes two or three naps each week for one to two hours each nap. Plaintiff stated that she tries to exercise using the Wii Fit and Wii Fit Plus every day, and at times she will walk her son to school. (TR 41). She testified that she takes medication that helps control her condition.

### B. Medical Evidence

The undersigned has thoroughly reviewed Plaintiff's medical record and will summarize limited portions of the record below.

Plaintiff received an initial psychiatric evaluation from Community Care Services in November 2008 in connection with a complaint made against her to Child Protective Services. (TR 246-49). She could repeat five numbers forward and four backward, identify two past Presidents, and name five large cities, but she had difficulty performing serial seven's and simple mathematical calculations. She was diagnosed by a psychiatrist with dysthymic disorder, rule out major depression, and assigned a GAF of 55.

Dr. Howard Rossman treated Plaintiff six times between February 4, 2008 and December 2, 2008. (TR 260-71). Plaintiff reported that she was seeking a second opinion concerning her 2002 diagnosis of remitting-relapsing multiple sclerosis. She reported that she lost her job in February 2002 because she was slower with cognitive tasks, and she indicated that her cognitive issues were worsening. Plaintiff complained of fatigue and reported a history of migraine cephalgia with associated photophobia, phonophobia, and occasional nausea. (TR 264). Dr. Rossman noted that Plaintiff's past medical history was significant for depression, generalized anxiety disorder, and migraine cephalgia without aura. On examination Dr. Rossman noted that Plaintiff had full strength in the bilateral upper and lower extremities both proximally and distally with the exception that the left upper extremity strength was four plus out of five. The doctor noted that there was mild pronator drift on the left, no Hoffman, and her left plantar reflex response was mute. He documented that Plaintiff's deep tendon reflexes were two plus out of four in the right biceps, triceps, brachioradialis, patella, and Achilles, and three out of four in the left biceps, triceps, brachioradialis, patella, and Achilles. (TR 265). He documented that Plaintiff had no involuntary movements, she was able to arise from a seated position without difficulty, and her gait was steady and symmetric with good arm swings. Dr. Rossman noted that an MRI of the brain was consistent

with central nervous system demyelination. He indicated that her neurological examination revealed left hemisoma greater than right hyperreflexia and four plus out of five weakness in the left upper extremity, with decreased dexterity of the left hand when compared to the right.

Plaintiff returned to Dr. Rossman on February 18, 2008. (TR 267-68). The doctor noted that a February 11, 2008 MRI of the brain revealed disease progression with an increase in the number of supratentorial lesions when compared to her 2003 MRI. Plaintiff complained of significant fatigue and reported that she often falls asleep at three in the afternoon and does not awaken until the next morning. A May 2008 examination by the nurse practitioner revealed that Plaintiff had full strength in all extremities, full range of motion in her neck, and a steady unassisted gait in a timed twenty-five foot walk. (TR 271).

Dr. Rossman completed a multiple sclerosis RFC questionnaire in May 2008. (TR 456-60). The doctor indicated that Plaintiff's symptoms were exaggerated by emotional issues and stress. He concluded that she remained capable of performing a low stress job. Dr. Rossman reported that Plaintiff could walk two blocks without rest, sit two hours at one time for a total of four hours in an eight hour workday, stand fifteen minutes at a time for a total of two hours in an eight hour workday, and take a fifteen minute to thirty minute unscheduled break every two to three hours. Dr. Rossman opined that Plaintiff could occasionally lift up to ten pounds and she had no limitations on performing a job requiring repetitive reaching, handling, or fingering. The doctor opined that Plaintiff would be absent from work one day a month.

In September 2008 Dr. Rossman examined Plaintiff and found that she was fully ambulatory without difficulty and her disease was stable. (TR 260). A December 2008 MRI showed nonenhancing demyelinating plaques involving the corpus collosum and supratentorial white matter,

4

with a solitary new lesion adjacent to the posterior horn of the left lateral ventricle. (TR 262).

Plaintiff was treated by Dr. Rossman and Dr. Martin Belkin four times between April 2009 and June 2009. (TR 272-78). Plaintiff reported that she was tolerating her treatment well and denied any worsening neurologic symptoms between her last visit on December 18, 2008 and April 13, 2009. (TR 272). Dr. Rossman noted that Plaintiff's December 2008 MRI revealed one new lesion but otherwise showed her condition was unchanged. On May 8, 2009 Plaintiff presented to Dr. Belkin with complaints of increased drooling, speech difficulties, and difficulty with swallowing. Plaintiff reported that she had a recent CT scan of her brain that revealed white matter changes which showed an exacerbation of her multiple sclerosis. (TR 276-77). In June 2009 Dr. Belkin stated that Plaintiff's recent MRI of May 11, 2009 revealed a new large lesion at the gray white junction of the right perisylvian region with contrast enhancement, representing an acute lesion and active disease. (TR 274). Dr. Belkin treated her with IV Solu-Medrol after which Plaintiff developed slurred speech, balance difficulties, and difficulties swallowing. (TR 274, 315-18). In June 2009 Dr. Belkin observed that Plaintiff's symptoms were much improved and essentially resolved. (TR 274). On physical examination Plaintiff's gait was fairly steady although somewhat slow, her muscle strength was full, reflexes were slightly brisk at the left patella as compared to the right but otherwise symmetrical, she had no dysarthria or dysphasia, and no Lhermitte sign.

A psychiatric consultation dated May 26, 2009 while Plaintiff was hospitalized for exacerbation of her multiple sclerosis symptoms revealed a diagnosis of depression with co-morbid anxiety, rule out mood disorder secondary to multiple sclerosis, rule out delirium and a GAF of 35 to 40. (TR 313-14). The examiner noted that there was no indication for inpatient psychiatric

5

treatment and reported that Plaintiff stated that she wanted to continue to follow her neurologist's advice to manage her psychiatric medication.

     Licensed psychologist and neuropsychologist Dr. Renee Applebaum, Ph.D, completed a neuropsychological evaluation in June 2009. (TR 328-36). The purpose of the testing was to assess Plaintiff's subjective complaints of diminished cognition associated with her diagnosis of relapsing-remitting multiple sclerosis. At the examination Plaintiff denied any physical symptoms associated with her multiple sclerosis. Dr. Applebaum noted that Plaintiff spoke extremely slowly and her speech was characterized by difficulties with word finding. (TR 331). The doctor observed that Plaintiff worked very slowly, required frequent encouragement to continue the testing, was frequently confused by task directions, and was tearful during the clinical interview. On the Wechsler Adult Intelligence Scale-3rd Revision (WAIS-III) Plaintiff earned a full scale IQ of 61, a verbal IQ of 61, and a performance IQ of 67, indicating an extremely low range of intelligence. (TR 332). Plaintiff was severely impaired on a fast paced verbal task, although she performed normally on a slow paced auditory task. (TR 333). She performed in the extremely low range on the working memory test. She performed in the borderline range for immediate memory and general memory. Plaintiff scored in the extremely low range for reading decoding, spelling, and arithmetic suggesting that she would have difficulty reading and generating even basic correspondence and performing basic mathematical computations required in everyday living. She performed in the impaired range on measures of simple and complex information processing speed. (TR 334). Plaintiff's routine problem solving and commonsense reasoning fell in the extremely low range and her motor speed was severely decreased bilaterally. Dr. Applebaum stated that Plaintiff would be considered mildly mentally retarded based on her IQ testing, although the doctor noted that this

assessment was not consistent with her reported work as a medical biller for seventeen years. The doctor further noted that the severity of Plaintiff's decreased processing speed was somewhat improbable. The doctor determined that he could not conclude that Plaintiff had cognitive deficits associated with multiple sclerosis as she did not demonstrate deficits in areas typically affected by the disease. (TR 335).

Tracy Pfromm, a single decision maker, completed a physical residual functional capacity assessment in September 2009. (TR 337-44). The examiner reported that Plaintiff could lift or carry ten pounds occasionally and less than ten pounds frequently, stand and/or walk at least two hours in an eight hour workday, sit about six hours in an eight hour workday, with unlimited push/pull activities. The examiner documented that Plaintiff could occasionally climb ramps or stairs, frequently balance, stoop, kneel, crouch, or crawl, and never climb ladders, ropes, or scaffolds. It was determined that Plaintiff had no manipulative, visual, communicative, or environmental limitations except that she should avoid concentrated exposure to fumes and she should avoid even moderate exposure to hazardous machinery or heights. (TR 341).

Leonard Balunas, Ph.D., completed a mental residual functional capacity assessment and psychiatric review technique in September 2009. (TR 345-62). In the mental RFC Dr. Balunas opined that Plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with others without being distracted by them, and respond appropriately to changes in the work setting. Dr. Balunas opined that Plaintiff was limited to low stress, unskilled, simple repetitive type tasks. In the psychiatric review technique Dr. Balunas assessed Plaintiff for cognitive disorders, depression, and anxiety under listings 12.02, 12.04 and 12.06. The doctor determined that

Plaintiff failed to satisfy any of the Part B criteria for the listings. Specifically, the doctor concluded that Plaintiff had moderate restrictions in maintaining concentration, persistence, or pace, mild restrictions in maintaining social functioning, no restrictions of activities of daily living, and no episodes of decompensation. (TR 359). The doctor also concluded that the evidence did not establish the presence of the "C" criteria.

Plaintiff presented to Henry Ford Health System in September 2010 where she was examined by Dr. Stanton Elias. (TR 363-65). Dr. Elias reported that Plaintiff had full neck range of motion, no back tenderness, normal speech and voice, full strength in the upper and lower extremities proximally and distally bilaterally, and a normal gait, but with a poor attention span. Plaintiff could recall three of three objects after a five minute delay. Dr. Elias noted that Plaintiff had reduced vibratory sense in both feet, but she walked with a normal base and stride and she walked well on heels, toes and tandem. Plaintiff reported that she experienced intermittent but no prolonged episodes of neurologic symptoms since 2002. Dr. Elias noted that Plaintiff's examination revealed very minimal neurological deficits. He opined that Plaintiff's cognitive impairments seemed to be more related to depression than to multiple sclerosis and indicated that this was something that could be further evaluated by neuropsychological testing.

On January 20, 2011 Plaintiff was again examined by Dr. Elias. (TR 406-07). Plaintiff reported that she had no new symptoms. On physical examination Dr. Elias documented that Plaintiff's gait was within normal limits, her vibratory sense was intact in all four extremities, she had normal bulk and tone in all four extremities proximally and distally bilaterally, she had no facial weakness, and her speech was normal. Dr. Elias concluded that Plaintiff has a history of neurologic dysfunction with MRI that has changed over time consistent with a diagnosis of multiple sclerosis.

On January 31, 2011 Dr. Elias completed a multiple sclerosis medical source statement based on his two evaluations of Plaintiff. (TR 425-28). The doctor noted that other than cognitive changes Plaintiff had experienced no exacerbations of her multiple sclerosis during the past year. He found that Plaintiff had poor attention and she was incapable of even low stress work due to a psychiatric disorder, she would miss more than four days of work each month, and she would be off-task twenty-five percent of the time. The doctor noted that Plaintiff was scheduled for neuropsychological testing.

Dr. Sonia Bernal, Ph.D., and Dr. Michael Ransom, Ph.D., completed a five-page neuropsychology assessment in February 2011. (TR 409-13). The doctors recounted episodes where Plaintiff used profanity and became verbally aggressive toward others, exhibited inappropriate interpersonal behavior, was uncooperative, had difficulty getting along with others, was easily distracted, showed very poor frustration tolerance, and required frequent prompting to complete tasks. The doctors noted that Plaintiff's insight and judgment appeared decreased, her speech was normal without noticeable word finding difficulties, and her movements were within normal limits. They noted that Plaintiff's results on her objective testing likely under represented her actual cognitive abilities. They indicated that Plaintiff earned a borderline-impaired full scale IQ of 76, her nonverbal skills were in the low-average range at 84, and her verbal abilities were in the borderline-impaired range at 73, well below what was expected based on her academic and vocational background, although well above what she had scored on her previous WAIS-III testing. They found that Plaintiff's overall index of information processing speed was impaired, her attention skills were better on more complex tasks than on simple tasks, and her manual dexterity was impaired bilaterally.

9

### IV.     VOCATIONAL EXPERT TESTIMONY

The ALJ asked the VE to testify whether jobs were available for an individual with Plaintiff's age, education, and past work experience who was able to perform unskilled sedentary work that is routine, low-stress, self-paced, repetitive, non-production oriented with (1) minimal contact with co-workers, supervisors, and the general public, (2) minimal changes in the work setting, (3) cannot climb ladders, ropes, or scaffolds, (4) can occasionally climb stairs, stoop, and crouch, (5) should avoid concentrated exposure to fumes, odors, and noxious gases, (6) should avoid temperature extremes and wet and humid conditions, (7) should avoid very loud noises, and (8) should avoid hazards such as moving machinery and unprotected heights. (TR 45-46). The VE testified that the hypothetical individual could perform unskilled sedentary jobs such as assembler, inspector, hand packager, and machine operator, comprising approximately 4,900 jobs in the State of Michigan. (TR 46-47).

Next, the ALJ asked the VE whether jobs were available for an individual who required a sit/stand option in addition to the above limitations. (TR 47). The VE testified that the same jobs would be available for such an individual. The VE testified that all occupations would be eliminated if an individual with these limitations would also need to be absent from work more than four days each month. (TR 48).

The VE next testified that no jobs would be available if the individual would be off-task for up to twenty percent of the workday and could not sustain concentration, persistence, or pace necessary to complete an eight hour workday five days a week on a regular and continuing basis due to frequent episodes of pain, lack of concentration, memory deficits, and a combination of other impairments. (TR 47).

## V.  ADMINISTRATIVE LAW JUDGE'S DETERMINATION

The ALJ found that although Plaintiff has not engaged in substantial gainful activity since December 23, 2008, the alleged onset of disability, and suffers from the severe impairments of multiple sclerosis, cognitive disorder, and depression, she did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). (TR 11-15).  The ALJ found that Plaintiff retained the ability to perform a limited range of unskilled sedentary work that is routine, low-stress, self-paced, repetitive, non-production oriented with (1) occasional contact with co-workers, supervisors, and the general public, (2) minimal changes in the work setting, (3) no climbing ladders, ropes, or scaffolds, (4) occasional climbing of stairs, stooping, and crouching, (5) requires a sit/stand option, (6) should avoid concentrated exposure to fumes, odors, and noxious gases, (7) avoid temperature extremes, wet and humid conditions, and very loud noises, and (8) avoid hazards such as moving machinery and unprotected heights. (TR 15-20). The ALJ concluded that although Plaintiff was unable to perform her past relevant work, she was not under a disability as defined in the Social Security Act from December 23, 2008, the alleged onset of disability date, through June 2, 2011, the date of the ALJ's decision, because there were a substantial number of jobs remaining in the national economy that Plaintiff could perform. (TR 21-22).

## VI.  LAW AND ANALYSIS

### A.  Standard Of Review

Pursuant to 42 U.S.C. § 405(g), the district court has jurisdiction to review the Commissioner's final decisions. Judicial review under this statute is limited to determining whether

the Commissioner's findings are supported by substantial evidence and whether the Commissioner's decision employed the proper legal standards. *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999).

**B.      Framework for Social Security Disability Determinations**

Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff was required to show that:

   1. she was not engaged in substantial gainful employment; and
   2. she suffered from a severe impairment; and
   3. the impairment met or was medically equal to a "listed impairment;" or
   4. she did not have the residual functional capacity to perform her past relevant work.

20 C.F.R. § 404.1520(a)-(f). If Plaintiff's impairments prevented her from doing her past relevant work, the Commissioner, at step five, would consider Plaintiff's RFC, age, education and past work experience to determine if she could perform other work. If she could not, she would be deemed disabled. 20 C.F.R. § 404.1520(g). The Commissioner has the burden of proof only on "the fifth

12

step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [plaintiff] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987) (citation omitted). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question if the question accurately portrays the plaintiff's physical and mental impairments. *Id.* (citations omitted).

**C.     Analysis**

Plaintiff argues that the ALJ failed to properly consider the January 2011 multiple sclerosis medical source statement of Plaintiff's treating source, Dr. Elias. She argues that the ALJ assigned little weight to Dr. Elias's opinion without considering the factors listed in 20 C.F.R. § 404.1527(c)(2).

It is well-settled that the opinions of treating physicians are generally accorded substantial deference. In fact, the ALJ must give a treating physician's opinion complete deference if it is supported by clinical and laboratory diagnostic evidence and it is not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2). When an ALJ determines that a treating source's medical opinion is not controlling, she must determine how much weight to assign that opinion in light of several factors: (1) length of the treatment relationship and frequency of examination; (2) nature and extent of the treatment relationship; (3) supportability of the opinion; (4) consistency of the opinion with the record as a whole; and (5) specialization of the treating source. 20 C.F.R. § 404.1527(c)(2)-(6).

There is no *per se* rule that requires an articulation of each of the six regulatory factors listed

in 20 C.F.R. § 404.1527(c)(2)-(6). *Norris v. Comm'r*, No. 11-11974, 2012 WL 3584664, at *5 (E.D. Mich. Aug. 20, 2012) (citing *Tilley v. Comm'r*, 394 Fed. Appx. 216, 222 (6th Cir. 2010)). An ALJ's failure to discuss the factors of § 1527(c)(2)-(6) may constitute harmless error 1) if "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it;" 2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion;" or 3) "where the Commissioner has met the goal of [§ 1527(c)]—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation." *Nelson v. Comm'r*, 195 Fed. Appx. 462, 470 (6th Cir. 2006) (citing *Wilson v. Comm'r*, 378 F.3d 541, 547 (6th Cir. 2004)).

The Commissioner requires its ALJs to "always give good reasons in [their] notice of determination or decision for the weight [they] give [a] treating source's opinion." 20 C.F.R. § 404.1527(c)(2). Those good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson v. Comm'r*, 378 F.3d at 544 (quoting Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *5 (1996)).

Plaintiff's argument that the ALJ failed to properly evaluate Dr. Elias's January 2011 multiple sclerosis medical source statement is not well taken. The ALJ reviewed the evidence pertaining to Plaintiff's impairments and specifically discussed Dr. Elias's two opinions and his multiple sclerosis medical source statement. (TR 16-18, 20). The ALJ noted that Dr. Elias was a neurologist at Henry Ford Hospital. (TR 17). She then reviewed Dr. Elias's September 2010 and January 2011 treatment notes and indicated that both evaluations showed that Plaintiff's multiple sclerosis was relatively stable. (TR 16). The ALJ noted the doctor's assessment that Plaintiff had

a poor attention span and his opinion that Plaintiff's cognitive issues appeared to be more related to her depression than to her multiple sclerosis. (TR 15, 18). The ALJ also discussed the fact that Plaintiff presented to the September 2010 evaluation with only intermittent symptoms and her examination revealed minimal neurologic deficits. (TR 17). The ALJ discussed Plaintiff's January 2011 examination with Dr. Elias and found that the examination showed that Plaintiff had no new symptoms, her vibratory sense was intact in all extremities, her gait was normal, and her physical examination was essentially normal. (TR 17).

Later in the opinion, after she discussed other relevant medical opinions, the ALJ discussed Dr. Elias's multiple sclerosis medical source opinion. (TR 20). The ALJ noted Dr. Elias's opinion that Plaintiff would need unscheduled breaks due to poor attention, she would be off-task twenty-five percent of the time, she was incapable of even a low-stress job, and she would be absent from work more than four days each month. (TR 20). The ALJ compared these findings against evidence that showed that Plaintiff's multiple sclerosis was relatively stable except for a brief exacerbation in 2009. She noted that Plaintiff's cognitive impairments were not supported by neuropsychological testing or by her academic and vocational backgrounds. The ALJ discussed evidence showing that Plaintiff's neuropsychological testing revealed that her results, while impaired, were simply not credible and were likely an under representation of her actual cognitive abilities. The ALJ further noted that Plaintiff's depression was being treated successfully with medication. The ALJ concluded that Dr. Elias's opinion was entitled to little weight. The ALJ also attributed little weight to a letter written by Dr. Elias in which he stated that Plaintiff's multiple sclerosis could account for her cognitive changes. (TR 20).

The undersigned finds no fault in the ALJ's evaluation of Dr. Elias's opinions. The ALJ's

conclusion that the above-cited opinions of Dr. Elias were entitled to little weight is supported by substantial evidence on the record. The ALJ satisfied the procedural requirements of 20 C.F.R. § 404.1527(c) and gave good reasons for not giving controlling weight to the opinions.

The ALJ considered the evidence of record and recognized that Plaintiff had the severe impairments of multiple sclerosis, cognitive disorder, and depression. She accounted for Plaintiff's credible impairments in a detailed RFC that limited Plaintiff to work that is unskilled, sedentary, routine, low-stress, self-paced, non-production oriented, and repetitive with occasional contact with co-workers, supervisors, and the general public; minimal changes in the work setting; no climbing ladders, ropes, or scaffolds; only occasional climbing of stairs, stooping, and crouching; permits a sit/stand option; avoids concentrated exposure to fumes, odors, and noxious gases; avoids temperature extremes, wet and humid conditions, and very loud noises; and avoids hazards such as moving machinery and unprotected heights. The ALJ then posed hypothetical questions to the VE that accounted for Plaintiff's limitations, and based her disability determination on testimony of the VE showing that a significant number of jobs existed in the national economy that Plaintiff could perform. The undersigned concludes that the ALJ's disability determination is supported by substantial evidence and should not be disturbed.

**REVIEW OF REPORT AND RECOMMENDATION**:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991). Filing objections that raise some issues but

fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated: February 14, 2013  s/ Mona K. Majzoub
MONA K. MAJZOUB
UNITED STATES MAGISTRATE JUDGE

**PROOF OF SERVICE**

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: February 14, 2013  s/ Lisa C. Bartlett
Case Manager